1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-FILED 11.14.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIDGE R. WARMUTH and JOSEPH WARMUTH, | ) CASE NO. CV 08-06222 MMM (AJWx) ) |
| Plaintiffs, | ) ) ) FINDINGS OF FACT AND |
| vs. | ) CONCLUSIONS OF LAW ) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, in its own name and as Receiver for IndyMac Bank, F.S.B., Pasadena, CA; DOES 1 through 10, | ) ) ) ) ) |
| Defendants. | ) ) ) ) ) |

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A). That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it. The FDIC made deposit insurance determinations for accounts held at IndyMac and notified depositors of the determinations via letter. Some depositors, including plaintiffs, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

Plaintiffs filed an opening brief on November 25, 2009.[1]  The defendant filed an opening

---

[1]Plaintiff's Opening Trial Brief ("Pls. Brief"), Docket No. 33 (Nov. 25, 2010).

1  brief on November 30, 2009.[2] The defendant filed a response on December 21, 2009.[3]  Following

2  the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the

3  "Dodd-Frank Act") on July 21, 2010, the parties submitted supplemental briefing regarding the

4  FDIC's revised deposit insurance determinations for plaintiffs' accounts.[4]

## I.  FINDINGS OF FACT

### A.    The Accounts

1.    Plaintiffs Midge Warmuth and Joseph Warmuth had six accounts with IndyMac prior to
      July 11, 2008.[5]

2.    Prior to that date, account XXXXXX3972 had a balance of $135,971.93 and was held by
      Midge Warmuth and Joseph Warmuth ITF Thru the Bible Radio.[6]

3.    Account XXXXXX5837 had a balance of $13,382.87 and was held by Joseph Warmuth
      ITF Midge Warmuth and Thru the Bible Radio.[7]

---

[2]Defendant Federal Deposit Insurance Corporation's Opening Trial Brief ("FDIC's Brief"), Docket No. 35 (Nov. 30, 2009).

[3]Defendant Federal Deposit Insurance Corporation's Response Trial Brief ("FDIC's Reply"), Docket No. 37 (Dec. 21, 2009).

[4]Opening Brief ("Plaintiff's Supp. Brief"), Docket No. 55 (Sept. 28, 2010);Response to Defendant FDIC's Opening Brief ("Plaintiff's Supp. Reply"), Docket No. 58 (Oct. 12, 2010); Defendant's Opening Brief ("FDIC's Supp. Brief"), Docket No. 56 (Sept. 28, 2010); Response filed by Defendant ("FDIC's Supp. Reply"), Docket No. 57 (Oct. 12, 2010).

[5]Declaration of Matthew Murphy Attaching Administrative Record ("Murphy Decl."), Docket No. 18  (May 18, 2009), ¶ 2.

[6]Murphy Decl., ¶ 2, Exh. A.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (Koch Decl., ¶ 3 n. 1.) Declaration of Victor Villarreal ("Villareal Decl."), Docket No. 33 (June 14, 2010), Exh. A. Victor Villareal is a Lead Information Technology Specialist at the FDIC who personally assisted with the transferring of electronic deposit account records maintained by IndyMac Bank to the FDIC's program for processing deposit insurance, known as the Receivership Liability System ("RLS").  (*Id.*, ¶ 1.)

[7]Murphy Decl., ¶ 2, Exh. A; Villarreal Decl., Exh. A.

4.    Account XXXXXX0831 had a balance of $15,327.95 and was held by Midge Warmuth and Joseph Warmuth ITF Thru the Bible Radio.[8]

5.    Account XXXXXX8325 had a balance of $90,011.22 and was held by Midge Warmuth ITF Joseph Warmuth and Thru the Bible Radio.[9]

6.    Account XXXXXX8491 had a balance of $25,580.45 and was held by Joseph Warmuth ITF Midge Warmuth and Thru the Bible Radio.[10]

7.    Account XXXXXX6982 had a balance of $7.23 and was held by Joseph Warmuth and Midge Warmuth in joint ownership.

8.    With the exception of account XXXXXX6982, all accounts were informal revocable trust accounts.  Account XXXXXX6982 was a joint ownership account.[11]

## B.    The FDIC's Recovery of IndyMac Data

9.    Before IndyMac Bank closed, the FDIC requested deposit account records maintained by the computer deposit system at IndyMac Bank.  The FDIC requested approximately 45 data fields for each deposit account along with electronic copies of trial balances, deposit application reconciliations, and the general ledger of the bank.  The FDIC requested this data in advance of IndyMac Bank's closure to test delivery capabilities, prove the balancing and reconciliation processes, and make certain that all required data fields had been included.[12]

10.    As a result, from March 20 to July 18, 2008, FDIC employees transferred files from the computers of IndyMac Bank to those of the FDIC.  Prior to IndyMac Bank's closure, the

---

[8]Murphy Decl., ¶ 2, Exh. A; Villarreal Decl., Exh. A.

[9]Murphy Decl., ¶ 2, Exh. A.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (*Id.* at n. 1.)  Murphy is a claims agent employed by the FDIC.  (*Id.*, ¶ 1.)

[10]Murphy Decl., ¶ 2, Exh. A; Declaration of Victor Villarreal ("Villarreal Decl."), Exh. A.

[11]Murphy Decl., ¶¶ 3–4.

[12]Villarreal Decl., ¶ 3.

FDIC's technical staff worked with IndyMac Bank to verify the accuracy of the data so that the files provided to the FDIC could be processed properly. The FDIC verified the sum of the current balance and accrued interest data fields. It also checked data against the bank's general ledger to ensure that the FDIC received all deposit products.[13]

11.   Subsequently, the FDIC transferred the computerized deposit account records of IndyMac Bank to its Receivership Liability System ("RLS"). This process involved three types of files maintained at IndyMac Bank:

a.   The "Deposit.csv" file, known as the "Deposit File," a database of deposit accounts;

b.   The "CIF.csv" file, known as the "Customer Information File," a database of all customers; and

c.   The "DIF_CIF.csv" file, known as the "CIF Joint File," which maps customers and their relationships to deposit accounts.[14]

12.   Combining information from the Deposit File and the Customer Information File, the FDIC created an account title in the RLS for each IndyMac Bank deposit account. The Deposit and Customer Information files provided the account number, the owner or owners of each account, the "relationship code" for the names on the account, the then-current deposit balance, the accrued interest, and the date the account was opened, among other information.[15]

13.   The "relationship code" is a code included in IndyMac Bank's Customer Information File that described the relationship between the account owner or owners and other names on the account, including beneficiaries. Names and relationship codes in the Customer Information File were used to create the account title for each account loaded into the RLS. These codes included:

---

[13]*Id.*, ¶ 5.

[14]*Id.*, ¶ 6.

[15]*Id.*

4

a.   "BNI," which stands for "beneficiary – individual trust," i.e., a beneficiary of a revocable trust account held by a single owner;

b.   "BNJ," which stands for "beneficiary – joint trust," i.e., a beneficiary of a revocable trust account held by multiple owners;

c.   "JBO," which stands for "joint owner with a beneficiary," i.e., a joint revocable trust account;

d.   "JTO," which stands for 'joint owner," i.e., a joint ownership account;

e.   "SLB," which stands for "sole owner with beneficiary," i.e., a beneficiary of a revocable trust account;

f.   "SOL," which stands for "individual owner," i.e., a single ownership account;

g.   "TRS," which stands for "trustee," i.e., funds held by a bank pursuant to an irrevocable trust account; and

h.   "TST," which stands for "trust," i.e., a formal revocable trust account.[16]

14.   The Customer Information File also uses the following acronyms:

a.   "AFT" means "as trustee for";

b.   "ITF" means "in trust for"; and

c.   "POD" means "payable-on-death to."[17]

15.   On July 11, 2008, after the FDIC closed out the day's business so that it could determine end-of-day account balances, it processed IndyMac Bank's deposit data for use in the RLS.[18]  Using all the data previously described, as uploaded from IndyMac Bank's deposit records, the RLS grouped depositors based on name, address, and tax identification number to produce a "Final Grouping Report."  The report lists the accounts owned by an individual depositor, the account balances in those accounts, and the account numbers.  If there are uninsured or potentially uninsured funds, the RLS also produces an "XX/PH

---

[16]*Id.*, ¶ 9.

[17]*Id.*, ¶ 10.

[18]*Id.*, ¶ 7.

5

Worksheet" for use by FDIC Claims Agents.[19]  The Final Grouping Report and the XX/PH Worksheet are reviewed by FDIC Claim Agents to approve a deposit insurance determination.  Once that determination is finalized, the RLS produces a Notice of Allowance of Claim and a Receivership Certificate for the uninsured balances.[20]

16.  In response to the court's order requiring the FDIC to augment the administrative record to provide source information, the FDIC submitted the information obtained from IndyMac Bank for plaintiffs' accounts that was used to populate the RLS.  These records show the account numbers, the owners, the relationship code for the names on the accounts, the then-current deposit balance, the accrued interest, and the date the account was opened.[21]

17.  The source information confirms that:

    a.  For account XXXXXX8325, Midge Warmuth is listed under relationship code "SLB," indicating that she was the sole owner with beneficiaries.  Joseph Warmuth and Thru the Bible Radio are listed under relationship code "BNI," indicating they are the beneficiaries of the revocable trust.  The account had a balance of $90,000.00 of deposited funds and $11.22 in accrued interest, confirming the RLS-reported balance of $90,011.22.[22]

    b.  For account XXXXXX6982, Midge and Joseph Warmuth are listed under relationship code "JBO," indicating that they are joint owners with a beneficiary.  The source information does not list a beneficiary.  The account had a balance of $7.32 in deposited funds and $0.00 in accrued interest, confirming the RLS-

---

[19]The abbreviation "XX" refers to "excess" or uninsured balances.  The abbreviation "PH" refers to "pass with hold" for potentially uninsured balances that require further review.  (*Id.*, ¶ 12.)

[20]*Id.*

[21]Villareal Decl., ¶ 14, Exh. A.

[22]*Id.*, Exh. A.

reported balance of $7.32.[23]

c.     For account XXXXXX8491, Joseph Warmuth is listed under relationship code "SLB," indicating that he was the sole owner with beneficiaries. Midge Warmuth and Thru the Bible Radio are listed under relationship code "BNI," indicating they are the beneficiaries of the revocable trust. The account had a balance of $25,577.26 in deposited funds and $3.19 in accrued interest, confirming the RLS-reported balance of $25,580.45.[24]

d.     For account XXXXXX0831, Midge Warmuth and Joseph Warmuth are listed under relationship code "JBO," indicating that they are joint owners with a beneficiary. Thru the Bible Radio is listed under relationship code "BNJ," indicating that it is the beneficiary of a jointly owned revocable trust. The account had a balance of $15,309.62 in deposited funds and $18.33 in accrued interest, confirming the RLS-reported balance of $15,327.95.[25]

e.     For account XXXXXX3972, Midge and Joseph Warmuth are listed under relationship code "JBO," indicating that they are joint owners with a beneficiary. Thru the Bible Radio is listed under relationship code "BNJ," indicating that it is the beneficiary of a jointly owned revocable trust. The account had a balance of $135,766.95 in principal and $204.98 in accrued interest, confirming the RLS-reported balance of $135,971.93.[26]

f.     On account XXXXXX5837, Joseph Warmuth is listed under relationship code "SLB," indicating that he is the sole owner with beneficiaries. Midge Warmuth and Thru the Bible Radio are listed under relationship code "BNI," indicating they are the beneficiaries of the revocable trust. The account had a balance of

---

[23]*Id.*, Exh. A.

[24]*Id.*, Exh. A.

[25]*Id.*, Exh. A.

[26]*Id.*, Exh. A.

$13,366.67 in deposited funds and $16.20 in accrued interest, confirming the RLS-reported balance of $13,382.87.[27]

## C.   The FDIC's Insurance Determination

18.   The FDIC as receiver for IndyMac assigned Matthew Murphy to review deposit insurance coverage and claims arising out of IndyMac's failure.  Murphy reviewed the six accounts at issue in this case.[28]

19.   On August 8, 9, 12, and 13, 2008, Murphy attempted to contact plaintiffs via telephone to inform them of his preliminary conclusions but was unable to reach them.[29]

20.   On August 14, 2008, Murphy concluded that under the deposit insurance rules codified at 12 C.F.R. § 330.10, accounts XXXXXX3972 and XXXXXX0831 were informal revocable trust accounts that had two owners, Midge and Josepht Warmuth, and one beneficiary, Thru the Bible Radio.  Murphy concluded that accounts XXXXXX5837 and XXXXXX8491 were informal revocable trust accounts that had one owner, Josepht Warmuth, and two beneficiaries, Midge Warmuth and Thru the Bible Radio.  Murphy concluded that account XXXXXX8325 was an informal revocable trust account that had one owner, Midge Warmuth, and two beneficiaries, Joseph Warmuth and Thru the Bible Radio.  Murphy finally concluded that account XXXXXX6982 was a joint ownership account with two owners, Joseph and Midge Warmuth.[30]

21.   Based on these determinations, Murphy found that, because account XXXXXX6982 was a joint ownership account, and because at the time of initial deposit insurance determination, joint ownership accounts were insured up to $100,000 for each owner,[31]

---

[27]*Id.*, Exh. A.

[28]Murphy Decl., ¶ 2.

[29]*Id.*, ¶ 5.

[30]*Id.*, ¶¶ 3–4.

[31]Under 12 C.F.R. § 330.9, each owner's interest in qualifying joint accounts are totaled. Had plaintiffs held other joint accounts, each of their interests in all of the joint accounts would

the account was fully insured for the balance of $7.32.[32]

22.   Because accounts XXXXXX3972 and XXXXXX0831 had two owners, Midge and Joseph Warmuth, Murphy concluded that each had a 50% ownership interest in the accounts, i.e., each had a $67,985.965 ownership interest in XXXXXX3972 and a $7,663.975 ownership interest in XXXXXX0831.[33]   Because accounts XXXXXX5837, XXXXXX8325, and XXXXXX8491 had two beneficiaries, Murphy concluded that each beneficiary had a 50% beneficial interest in the accounts.   Thus, Midge Warmuth and Thru the Bible Radio each held a $6,691.435 interest in XXXXXX5837, Josepth Warmuth and Thru the Bible Radio each held a $45,005.61 interest in XXXXXX8325, and Midge Warmuth and Thru the Bible Radio each held a $12,790.225 interest in XXXXXX8491.[34]

23.   Murphy concluded that Thru the Bible Radio was not a qualifying beneficiary under then-applicable regulations because it was not an account owner's spouse, child, grandchild, parent, or sibling.   12 C.F.R. 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999). Murphy concluded that funds held by Midge Warmuth ITF for Thru the Bible Radio would be treated as part of Midge Warmuth's single ownership category of accounts and that funds held by Josepth Warmuth ITF for Thru the Bible Radio would be treated as part of Joseph Warmuth's single ownership category of accounts.[35]   Each set of aggregated single ownership funds was insured up to $100,000.

24.   Murphy further concluded that the each of Midge Warmuth and Joseph Warmuth was a qualifying beneficiary for accounts held by the other.   thus, insurance of up to $100,000

have been totaled and insurance of $200,000 would have been available on all of the joint accounts.   As there was only one joint account, however, it is clear that the balance in that account of $7.32 was insured.

[32]*Id.*, ¶¶ 4, 7.

[33]*Id.*, ¶ 12.

[34]*Id.*

[35]*Id.*, ¶ 8.

1  was available for each beneficiary.[36]

2  25.   Joseph Warmuth held funds in trust for Midge Warmuth in accounts XXXXXX5837 and

3  XXXXXX8491 in the amount of $19,481.66. Because this amount was less than

4  $100,000, that amount was deemed fully insured.[37]

5  26.   Midge Warmuth held funds in trust for Joseph Warmuth in account XXXXXX8325 in the

6  amount of $45,005.61. Because this amount was less than $100,000, these funds too were

7  fully insured.[38]

8  27.   Funds Joseph Warmuth held in trust for Thru the Bible Radio in accounts XXXXXX5837,

9  XXXXXX8491, XXXXXX3972, and XXXXXX0831 totaled $95,131.61. Because Thru

10  the Bible Radio was not a qualifying beneficiary, these funds were treated as solely owned

11  by Joseph Warmuth. Because the amount was less than $100,000, the funds were deemed

12  fully insured.[39]

13  28.   Funds Midge Warmuth held in trust for Thru the Bible Radio in accounts XXXXXX3972,

14  XXXXXX0831, and XXXXXX8325 totaled $120,655.55. As Thru the Bible Radio was

[36]*Id.*, ¶¶ 9–10.

[37]*Id.*, ¶ 9. As noted, this included Midge Warmuth's 50% beneficial share of XXXXXX5837 in the amount of $6,691.435 and her 50% beneficial share of XXXXXX8491 of $12,790.225. The other 50% of the funds held in these accounts was attributed to Thru the Bible Radio, which was not a qualifying beneficiary. Accordingly, the funds were treated as solely owned by Joseph Warmuth.

[38]*Id.*, ¶ 10. As noted, this included Josepth Warmuth's 50% beneficial share of XXXXXX8325. The other 50% of the funds held in this account was attributed to Thru the Bible Radio, which was not a qualifying beneficiary. Accordingly, the funds were treated as solely owned by Midge Warmuth.

[39]*Id.*, ¶ 11. As noted, this included Thru the Bible Radio's 50% beneficial share of XXXXXX5837 in the amount of $6,691.435, its 50% beneficial share of XXXXXX8491 of $12,790.225, its 50% beneficial share of XXXXXX3972 in the amount of $67,985.965, and its 50% beneficial share of XXXXXX0831 in the amount of $7,663.975. The other 50% of the funds held in the first two accounts was held by Joseph Warmuth ITF Midge Warmuth. The remaining 50% of the funds held in the third and fourth listed accounts was held by Midge Warmuth ITF Thru the Bible Radio.

1   not a qualifying beneficiary, these funds were treated as solely owned by Midge Warmuth.

2   Midge Warmuth was entitled to $100,000 in insurance for funds owned solely by her.

3   Consequently, $100,000 of this amount was deemed insured and $20,655.55 was deemed

4   uninsured.

5   29.   On August 14, 2008, the FDIC sent plaintiffs a Receivership Certificate in the amount of

6   $20,655.55.[40]

7   30.   Based on the FDIC's calculation that disposition of IndyMac's assets would result in a

8   recovery of approximately 50% of the uninsured deposits of IndyMac, FDIC sent plaintiffs

9   a 50% advance dividend of $10,327.78.[41]

10   31.   On July 21, 2010, the Dodd-Frank Act, Pub. L. No.1 I 1-203, took effect. Section 335 of

11   the Dodd-Frank Act amended the Federal Deposit Insurance Act, 12 U.S.C.

12   § 1821(a)(1)(E), by increasing the standard maximum deposit insurance amount

13   ("SMDIA") from $100,000 to $250,000.   The act made the increase permanent and

14   retroactive to January 1, 2008.  Section 335 directed that, in applying the $250,000 deposit

15   insurance amount retroactively to January 1, 2008, the FDIC subtract: (1) deposit

16   insurance previously paid to depositors by the FDIC, and (2) payments (such as dividends)

17   previously made to depositors by the FDIC as Receiver.[42]

18   32.   Immediately following the effective date of the Dodd-Frank Act, the FDIC calculated the

19   increased deposit insurance amounts due IndyMac Bank depositors with uninsured deposit

20   balances.[43]   The starting point for the FDIC's analysis was its final deposit insurance

21   determination following the bank's closure in 2008,[44] specifically each depositor's account

---

[40]*Id.*, ¶ 13; Exh. B.

[41]*Id.*, ¶ 14.

[42]Davis Decl., ¶ 5.

[43]*Id.*, ¶ 6.

[44]*Id.*

1   balance as of July 11, 2008, the amount of insurance provided to each depositor, the

2   amount of any Receivership Certificates sent to depositors, and the amount of the 50%

3   advance dividend paid to depositors.[45]

4   33.   As a result of the Dodd-Frank Act, the FDIC concluded that plaintiffs' deposits were fully

5   insured.  Because it had already paid plaintiffs a dividend equal to 50% of the previously

6   uninsured balance of $20,655.55, the FDIC Receiver sent plaintiffs a check for $10,327.77

7   on July 22, 2010.[46]

## II.  CONCLUSIONS OF LAW

### A.   Standard of Review

11   34.   The FDIC's determination of insurance coverage is governed by the Federal Deposit

12   Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

13   35.   The FDIC's final determination "regarding any claim for insurance coverage [is] a final

14   agency action reviewable in accordance with" the Administrative Procedure Act ("APA").

15   12 U.S.C. § 1821(f)(4).  Under the APA, the court examines whether the FDIC's decision

16   was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

17   law." 5 U.S.C. § 706(2)(A).   Accordingly, the relevant question the court must answer

18   is whether the FDIC's action was arbitrary or capricious.

19   36.   Final agency decision is arbitrary and capricious if the agency "'has relied on factors which

20   Congress has not intended it to consider, entirely failed to consider an important aspect of

21   the problem, offered an explanation for its decision that runs counter to the evidence before

22   the agency, or is so implausible that it could not be ascribed to a difference in view or the

23   product of agency expertise.'"   *O'Keeffe's Inc. v. U.S. Consumer Product Safety*

24   *Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers'*

---

26   [45]*Id*. Ex. C (FDIC's record of payments made to plaintiffs, including Receivership

27   Certificates and dividends).

28   [46]See Plaintiffs' Supp. Brief at 22 (noting receipt of a check from the FDIC).

1    *Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

2    37.   A district court is limited to a review of the reasoning on which the agency relied in

3          making its decision.  *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007)

4          (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  It can "uphold a decision of less

5          than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicles*

6          *Manufacturers' Association*, 463 U.S. at 43.  Where an agency offers an "interpretation

7          of its own regulation [that] reflects its considered views," even if those views  are

8          developed in response to litigation and communicated in a legal brief, the court should

9          accept the interpretation if convinced it is not "merely a *post hoc* rationalization."  *Long*

10         *Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007).  See also *Alaska v. Federal*

11         *Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir. 2008) ("While we may not fabricate a

12         rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity

13         if the agency's path may reasonably be discerned,'" quoting *Motor Vehicles*

14         *Manufacturers' Association*, 463 U.S. at 43).  "'Nevertheless, the agency must examine

15         the relevant data and articulate a satisfactory explanation for its action including a rational

16         connection between the facts found and the choice made.'"  *Northwest Coalition for*

17         *Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544

18         F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicles Manufacturers' Association*, 463

19         U.S. at 43).

20   38.   "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly

21         erroneous' or inconsistent with 'the regulations being interpreted.'"  *Public Citizen v.*

22         *Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir. 2009) (quoting *Long Island*

23         *Care at Home*, 551 U.S. at 171).  See also *Long Island Care at Home*, 551 U.S. at 170-71

24         ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation

25         alone presents no separate ground for disregarding the Department's present

26         interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir.

27         2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies

28         and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)).  "In other

words, we must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1131 (9th Cir. 2003) ("When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission*, 499 U.S. 144, 150-51 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries Service*, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation").

**B.     Supplementation of the Record**

39.   Although judicial review of an agency's decision under 5 U.S.C. § 706 is typically confined to the administrative record, courts have crafted narrow exceptions to this rule. See, e.g., *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("In limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'   These limited exceptions operate to identify and plug holes in the administrative record.   Though widely accepted, these exceptions are narrowly construed and applied" (citations omitted)).

40.   The Ninth Circuit has held that "[t]he 'whole' administrative record [ ] consists of all documents and materials directly *or indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. United States Department of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal quotation marks and

1      citation omitted).

2   41.   When a reviewing court finds it necessary to look outside the administrative record to

3         evaluate whether an agency has considered all relevant factors and adequately explained

4         its decision, the court should obtain additional explanations of agency action from the

5         agency itself. *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) ("If . . . there was such failure

6         to explain administrative action as to frustrate effective judicial review, the remedy was not

7         to hold a de novo hearing but, as contemplated by *Overton Park*, to obtain from the

8         agency, either through affidavits or testimony, such additional explanation of the reasons

9         for the agency decision as may prove necessary"); see also, e.g., *Animal Defense Council

10        v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (quoting *Camp*).  In such instances, "[t]he

11        court's inquiry outside the record is limited to determining whether the agency has

12        considered all relevant factors or has explained its course of conduct or grounds of

13        decision." *Id.* (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)).

14  42.   By contrast, where it appears that the agency has relied on documents not included in the

15        administrative record, "supplementation is appropriate." *Portland Audubon Society*, 984

16        F.2d at 1548.  In such instances, "the crux of the analysis is whether the documents or

17        materials [that a party requests be added to the administrative record] were actually

18        considered, directly or indirectly, by the agency decisionmakers." *Pacific Coast

19        Federation of Fishermen's Association/ Institute for Fisheries Resources v. Gutierrez*, No.

20        1:06-CV-00245 OWW LJO, 2007 WL 1752287, *2 (E.D. Cal. June 15, 2007) (citing

21        *Thompson*, 885 F.2d at 555).

22  43.   The FDIC's deposit insurance determinations are governed by the regulations set forth in

23        12 C.F.R. § 330 as of July 11, 2008.[47]  These regulations define "deposit account records"

24        as including "account ledgers, signature cards, certificates of deposit, passbooks, corporate

25        resolutions authorizing accounts in the possession of the insured depository institution and

26

27        [47]See *Henry v. Federal Deposit Insurance Corp.*, __ F.Supp.2d __, 2010 WL 608019,
         *13–14 (C.D. Cal. Feb. 18, 2010) (concluding that the regulation governing a particular insurance
28        determination is the regulation in place on the date that the bank failed).

1   other books and records of the insured depository institution, including records maintained

2   by computer, which relate to the insured depository institution's deposit taking function."

3   12 C.F.R. § 330.1(e).[48]  Regulations providing for the recognition of deposit ownership

4   and fiduciary relationships note that, except under circumstances not relevant here, when

5   "determining the amount of insurance available to each depositor, the FDIC shall presume

6   that deposited funds are actually owned in the manner indicated on the deposit account

7   records of the insured depository institution."  12 C.F.R. § 330.5(a)(1).[49]  Significantly,

8   there is no mention of the RLS in the FDIC's governing regulations.

9   44.   Although it is clear to the court that the FDIC relied directly or indirectly on some

10   document or documents in compiling the information in the RLS, this direct or indirect

11   reliance has been explained by the information submitted by the FDIC regarding population

12   of the RLS using IndyMac data and the complete record includes the IndyMac source

13   information.   As noted, where it appears that the agency has relied on documents not

14   included in the administrative record, "supplementation is appropriate."  *Portland Audubon*

15   *Society*, 984 F.2d at 1548.  In the present case, however, the administrative record appears

16   to rely upon only documents in the administrative record; namely IndyMac Bank's

---

18   [48]The term excludes "account statements, deposit slips, items deposited or cancelled
19   checks."  12 C.F.R. § 330.1(e).

20   [49]The provision further states:
21   "If the FDIC, in its sole discretion, determines that the deposit account records of
     the insured depository institution are clear and unambiguous, those records shall be
22   considered binding on the depositor, and the FDIC shall consider no other records
     on the manner in which the funds are owned.  If the deposit account records are
23   ambiguous or unclear on the manner in which the funds are owned, then the FDIC
     may, in its sole discretion, consider evidence other than the deposit account records
24   of the insured depository institution for the purpose of establishing the manner in
     which the funds are owned.  Despite the general requirements of this paragraph
25   (a)(1), if the FDIC has reason to believe that the insured depository institution's
     deposit account records misrepresent the actual ownership of deposited funds and
26   such misrepresentation would increase deposit insurance coverage, the FDIC may
     consider all available evidence and pay claims for insured deposits on the basis of
27   the actual rather than the misrepresented ownership."  12 C.F.R. § 330.5(a)(1).
28

1        computerized deposit account records.

2    45.  Plaintiffs requested additional discovery in the form of three requests for admission and

3        related interrogatories and request for production of documents.[50]   The court denied

4        plaintiffs' request, but permitted plaintiffs to take discovery strictly limited to the types of

5        records enumerated in 12 C.F.R. § 330.1(e), upon which the FDIC relied in reaching its

6        final deposit insurance determination, as well as any other information that the FDIC, in

7        its discretion, gathered and considered concerning plaintiffs' accounts prior to the date the

8        insurance determination was made (e.g., communications between the FDIC and plaintiffs

9        or between the FDIC and IndyMac employees). Cf. 12 C.F.R. § 330.5(a)(1).   Neither

10       party has advised te court whether any documents were produced following its entry of this

11       order.  Plaintiffs, moreover, did not seek to augment the administrative record with any

12       additional documents.

13   46.  "Judicial review of an agency decision typically focuses on the administrative record in

14       existence at the time of the decision and does not encompass any part of the record that is

15       made initially in the reviewing court." *Southwest Center for Biological Diversity v. United*

16       *States Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996).  See also *Center for Biological*

17       *Diversity v. U.S. Bureau of Land Management*, No. C-06-4884-SI, 2007 WL 3049869, *3

18       (N.D. Cal. Oct. 18, 2007) ("Judicial review of the agency action must be based on the

19       whole administrative record, which includes everything that was before the agency

20       pertaining to the merits of its decision").  "[T]he focal point for judicial review [must] be

21   _____

22       [50]Plaintiffs' requests for admission stated: "1. Admit that employee(s) of IndyMac Bank
         instructed plaintiffs how to set up their bank accounts to ensure full FDIC insurance coverage for

23       all of plaintiffs' funds.  2. Admit that IndyMac Bank employees set up plaintiffs' accounts in the

24       manner advised by said employees. 3. Admit that IndyMac Bank employees assured plaintiffs that
         all the funds in plaintiffs' accounts were fully insured." (Petition for Further Discovery, Docket

25       No. 22 (June 23, 2009).)  The interrogatory stated: "If your response to any of the Requests for
         Admission served herewith is anything other than an unqualified 'Admit,' please identify all facts

26       and witnesses which support, evidence, or relate to your response." (*Id.*)  The request for
         production of documents stated: "If your response to any of the Requests for Admission served

27       herewith is anything other than an unqualified 'Admit,' please produce all documents which

28       support, evidence, or otherwise relate to your response." (*Id.*)

the administrative record already in existence, not some new record made initially in the reviewing court." *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) (internal citation and quotation marks omitted).

47.   Nonetheless, "[t]he [administrative] record is not necessarily those documents that the agency has compiled and submitted as the administrative record; the court must look to all the evidence that was before the decision-making body." *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (internal citations and quotations marks omitted).   See also *Thompson*, 885 F.2d at 555-56 ("[t]he . . . administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position" (emphasis original)).   After considering the administrative record, the court may conclude (1) that the rationale for the agency's decision is not sufficiently explained in the record; or (2) that the evidence in the record is insufficient to support the agency's finding.   If there is "such failure to explain administrative action as to frustrate effective judicial review, the remedy [is] . . . to obtain from the agency . . . such additional explanation of the reasons for the agency decision as may prove necessary." *Camp*, 411 U.S. at 142-43.   See also *City and County of San Francisco v. United States*, 930 F.Supp. 1348, 1355-56 (N.D. Cal. 1996) ("When the administrative record so fails to explain agency action that judicial review of that action is effectively frustrated, the court may 'obtain from the agency, either through affidavits or testimony, such additional reasons for the agency decision as may prove necessary.' . . .   Similarly, the court may inquire outside of the administrative record 'when it appears the agency has relied on documents or materials not included in the record,'" quoting *Camp*, 411 U.S. at 143).

48.   On June 14, 2010, the FDIC filed, together with the administrative record, a declaration by an FDIC lead information technology specialist, which attached source information representing original IndyMac Bank computerized deposit account records.   The source information is the type of a record contemplated by 12 C.F.R. § 330.1(e) in that the FDIC relied on it, directly or indirectly, in reaching its final deposit insurance determination.

12 C.F.R. § 330.5(a)(1); § 330.1(e) ("Deposit account records . . . includ[e] records maintained by computer, which relate to the insured depository institution's deposit taking function").   The declaration (1) explains the methodology whereby the RLS database was populated from deposit account records maintained by IndyMac Bank; (2) attaches IndyMac Bank deposit account records reflecting the deposit balance and nature of the accounts held by IndyMac Bank; and (3) explains all technical terms and abbreviations used by both the RLS and the IndyMac Bank source information.   It is clear from the Villareal declaration that this source information is the data indirectly relied upon by the FDIC in populating the RLS.

C.     **Whether the FDIC Properly Determined the Ownership of the Accounts**

49.   The FDIC's deposit insurance determinations are governed by the regulations set forth in 12 C.F.R. Part 330.  As noted earlier, regulations concerning the recognition of deposit ownership and fiduciary relationships note that, except in circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1). See also *Villafane-Neriz v. F.D.I.C.*, 75 F.3d 727, 731 (1st Cir. 1996) (holding that the FDIC "is entitled to rely exclusively on the account records of the failed institution," and that "while ownership under state law is one prerequisite for insurance coverage, the deposit account records are controlling").  "Deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).  Under this definition, IndyMac Bank's computerized data was a deposit account record on which the FDIC was entitled to rely.

50.   At the time IndyMac closed, revocable trust accounts were insured up to $100,000 per owner if certain conditions were met.  First, the title of the account had to reflect that the

funds were held pursuant to a formal revocable trust created by an owner or grantor.  The owner or grantor was required to retain ownership of the account during his or her life.  12 C.F.R. § 330.10(f)(1), (4) (2008), 69 Fed. Reg. 2829-30 (Jan. 21, 2004) (stating that "revocable trust accounts held in connection with a formal revocable trust created by an owner/grantor and over which the owner/grantor retains ownership during his or her lifetime," qualify for coverage if "the title of the account . . . reflect[s] that the funds in the account are held pursuant to a formal revocable trust").  Second, while the beneficiaries need not be identified by name in the deposit account records, they must be "qualifying" beneficiaries.  The "owner's spouse, child/children, grandchild/grandchildren, parent/parents, brother/brothers or sister/sisters" are "qualifying beneficiaries."  12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999).[51]

51.   While the trust owner is the insured party, insurance coverage is provided for the interest of each qualifying beneficiary up to $100,000.  12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999); 12 C.F.R. § 330.10(f)(1) (2008), 69 Fed. Reg. 2829 (Jan. 21, 2004).

52.   Stated differently, the FDIC insured each grantor up to $100,000 for the interest of each qualifying beneficiary.  If each grantor held an amount for the benefit of the same qualifying beneficiary, those amounts were separately insured.  12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760-61 (May 11, 1998); Advisory Opinion FDIC-05-05, Question Regarding Deposit Insurance for a "Spousal Revocable Living Trust," 2005 WL 2979649, *1-2 (Sept. 12, 2005) ("Under this rule, the FDIC would assume . . . that the two grantors . . . have contributed equal amounts. . . .  The amount contributed by each grantor for

---

[51]Under the regulations in effect when IndyMac closed and the FDIC made the initial insurance determination challenged in this action, there was "no requirement . . . that the deposit account[ ] records of the depository institution indicate the names of the beneficiaries of the living trust and their ownership interests in the trust."  12 C.F.R. 330.10(f)(1), (4) (2008) 69 Fed. Reg. 2830 (Jan. 21, 2004).

each 'qualifying beneficiary' would be insured separately"). [52]

53.   A qualifying joint account is insured separately from an individually owned or single ownership deposit account maintained by the co-owners.  A qualifying joint account in the name of both the husband and wife at the time IndyMac Bank failed was insured up to $200,000 irrespective of funds deposited in accounts held by the spouses individually.  12 C.F.R. § 330.9(a) ("Qualifying joint accounts in the names of both husband and wife which are comprised of community property funds shall be added together and insured up to [$200,000], separately from any funds deposited into accounts bearing their individual names").  A joint account qualifies for separate treatment if all co-owners are natural persons, if each co-owner has personally signed a deposit account signature card, and if each co-owner possesses withdrawal rights on the same basis.  *Id.*, § 330.9(c).[53]

54.   The five informal revocable trust accounts had one or two owners.  The beneficiaries were Thru the Bible Radio and either Midge or Joseph Warmuth.  Because Midge and Joseph Warmuth were each a qualifying beneficiary, their interest in the accounts was insured up to $100,000.  Because Thru the Bible Radio was not a qualifying beneficiary, Murphy counted its interest in the accounts as part of the owner's single ownership accounts.  Insurance for each of Joseph and Midge Warmuth's combined sole ownership accounts was available up to $100,000.[54]

---

[52]While this advisory opinion does not appear in the Federal Register, it does represent an authoritative opinion of the FDIC regarding the interpretation of its own rules.  *Public Citizen*, 573 F.3d at 923 (quoting *Long Island Care at Home*, 551 U.S. at 171) ("[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted'").

[53]Although neither party has provided documentation for account XXXXXX6982 verifying these three requirements, the FDIC determined that the account was fully insured, and plaintiffs do not challenge this finding.

[54]Plaintiffs' one page trial brief does not dispute the FDIC's insurance determination.  Plaintiffs state only that "[t]he accounts were set up by and at the direction of [the] Bank's manager, and other employees . . . .  Plaintiffs were assured by [the] Bank that all their money was fully insured and protected. . . .  Because plaintiffs relied on [the] Bank's directions and

55.  The FDIC's final deposit determination regarding plaintiffs' accounts was in accordance with the law and supported by the evidence upon which FDIC was required to rely.

**D.   Whether the FDIC Properly Determined Plaintiffs' Entitlement to Additional Deposit Insurance Following Passage of the Dodd-Frank Act**

56.  "Section 335 of the [Dodd-Frank Act] retroactively increases the standard maximum deposit insurance amount from $100,000 to $250,000 for depositors in any institution for which, as here, the FDIC was appointed as receiver between January 1, 2008, and October 3, 2008." *Sunflower Bank, N.A. v. F.D.I.C.*, No. 09-4006-SAC, 2010 WL 3913597, *2 n. 4 (D. Kan. Sept. 30, 2010), citing Pub.L. No. 111-203.

57.  Section 335 of the Dodd-Frank Act requires that "any payment on a deposit claim made by the [FDIC] as receiver. . . to a depositor above the standard maximum deposit insurance amount in effect at the time of the appointment of the [FDIC] as receiver . . . shall be deemed to be part of the net amount due to the depositor under" 12 U.S.C. § 1821(a)(l)(B); Pub. L. No. 111-203, § 335,124 Stat. 1376 (July 21, 2010) (amending 12 U.S.C. § 1821(a)(l)(E)).

58.  As a result of the application of the retroactive $250,000 insurance coverage under the Dodd-Frank Act, the FDIC concluded that plaintiffs' deposits were fully insured.  Because it had previously paid plaintiffs a dividend  of $10,327.78, the FDIC Receiver sent plaintiffs a check for $10,327.77, or 50% of the $20,655.55 deposit insurance balance previously deemed uninsured, on July 22, 2010.  Plaintiffs acknowledge receipt of these

---

misinformation, the FDIC should be estopped from claiming that any portion of plaintiffs' funds is uninsured and/or unavailable to them." (Pls.' Brief at 1.)  Plaintiffs, who were represented at the time the brief was filed, cite no law supporting this proposition and the court cannot identify any rule of law that would estop the FDIC based on representations made by bank employees. Cf. *Brandt v. Hinkel*, 427 F.2d 53, 56-57 (9th Cir. 1970) (discussing the limited circumstances in which an agency can be estopped due to a misrepresentation by one of its representatives). Allegations regarding the malfeasance of the bank, or its agents or representatives, are properly addressed in a claim raised under 12 U.S.C. § 1821(d).  Although their complaint did not include such a claim, plaintiffs raised the issue in their trial brief.  For the reasons stated in *Nasoordeen v. F.D.I.C.*, No. CV 08-05631 MMM (AJWx), 2010 WL 1135888 (C.D. Cal. Mar. 17, 2010), any such claim would be barred by the doctrine of prudential mootness.

1  funds.[55]  As a consequence, no further insurance payments are owed.

2  59.  The FDIC's final deposit insurance determination regarding plaintiffs' accounts was thus

3  in accordance with the law and supported by the evidence upon which the FDIC must rely.

4  See 5 U.S.C. § 706(2)(A); *O'Keeffe's, Inc.*, 92 F.3d at 942.

5  60.  Plaintiffs claim that they are entitled to interest, fees, and costs based on the FDIC's

6  alleged arbitrary and capricious final deposit determination.[56]  In the first place, the court

7  has found that the FDIC's insurance determination was correct; plaintiffs have thus failed

8  to demonstrate that the agency acted arbitrarily or capriciously.  The Ninth Circuit has

9  held, moreover, that sovereign immunity applies to the FDIC and bars all claims against

10  it for the payment of interest.  See, e.g., *Battista v. FDIC*, 195 F.3d 1113, 1120 (9th Cir.

11  1999) ("Congress has not expressly waived the FDIC's immunity against prejudgment

12  interest, nor does the FDIC fall under the exception of the government's waiver immunity

13  when it operates as a commercial entity"); *Sharpe v. FDIC*, 126 F 3d 1147, 1154 n. 3 (9th

14  Cir. 1997) (stating that sovereign immunity bars an award of prejudgment interest against

15  the FDIC); *Far West Federal Bankv. OTS-Direcfor*, 119 F.3d 1358, 1366-67 (9th Cir.

16  1997) (same); see also *Spawn v. Western Bank-Westheimer*, 989 F.2d 830, 838 (5th Cir.

17  1993) ("[W]e hold that the FDIC is immune from prejudgment interest awards in the

18  context of erroneous deposit insurance determinations").

19  61.  Where the FDIC acts as a deposit insurer - as it has here - it retains its sovereign immunity

20  as a regulator and an agency of the United States.  *Spawn*, 989 F.2d at 838.  This an award

21  of attorneys' fees or litigation costs against it.  See *Anderson v. United States*, 127 F.3d

---

[55]See Plaintiffs' Supp. Brief at 22 (noting receipt of a check from the FDIC).

[56]On August 3, 2011, plaintiff Midge Warmuth filed a brief captioned "request for ruling," in which she contended that she was entitled to recover "accrued interest and other damages," and stated that she "also expect[s] to be paid for the time that I put in . . . on this case" due to the FDIC's alleged arbitrary and capricious final deposit insurance determination.  (Request for Ruling, Docket No. 61 (Aug. 3, 2011).)  Because the FDIC's insurance determination was correct, it did not act arbitrarily or capriciously.  Nor, as with the other forms of relief plaintiffs seek, has Congress waived the FDIC's immunity from suit for amounts necessary to compensate plaintiffs for time spent litigating against it.

1190, 1191 (9th Cir. 1997) ("[S]overeign immunity bars an award of attorneys' fees against the United States unless a statute expressly authorizes such an award"); *Campbell v. United States*, 835 F. 2d 193, 195 (9th Cir. 1987) ("Except to the extent it has waived its immunity, the federal government is immune from claims for attorneys' fees"); *Van Hoomissen v. Xerox Corp.*, 503 F.2d 1131, 1132 (9th Cir. 1974) ("[T]he government is exempt from liability for costs and attorneys' fees except as specifically and unequivocally authorized by Congress"); see also *Cunningham v. FBI*, 664 F.2d 383, 384 (3d Cir. 1981) ("In the absence of any express waiver of sovereign immunity, costs and expenses of litigation are not recoverable from the United States").

62.   The Dodd-Frank Act neither waives the FDIC's sovereign immunity nor provides for the payment of interest, fees, or costs.  Consequently, plaintiffs are not entitled to an award of interest, fees, or costs.

### III. CONCLUSION

For the reasons stated, the court finds that the FDIC's deposit insurance determinations, both before and after the passage of the Dodd-Frank Act, were correct and that the agency did not act arbitrarily or capriciously.  The court further finds that plaintiffs are not entitled to recover interest, attorneys' fees, costs or other damages from the FDIC.

DATED: November 14, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

24